**JARED J. SCHARF**
ATTORNEY AT LAW
1025 WESTCHESTER AVENUE • SUITE 305
WHITE PLAINS, NEW YORK  10604
(914) 682-9777

September 16, 2005

TELECOPIER 212-805-7941

Hon. Loretta A. Preska
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street, Room 1320
New York, New York 10007

                Re:  United States v. Noorulah Zadran
                      S1 04 Cr. 1185 (LAP)

Dear Judge Preska:

      This office represents defendant Noorullah Zadran.  Mr. Zadran is scheduled to be sentenced by your Honor on September 20, 2005.  I write this letter as a sentencing memorandum and as a response to statements and recommendations contained in the Pre-Sentence Investigation Report ("Report") and in Mr. Miller's letter transmitted last evening.

      Probation and the government recommend that Mr. Zadran be sentenced to a term of imprisonment within the Guidelines, which call for a minimum of two months and a maximum of eight months.  Offense Level 7 and Criminal History Category II combine to place Mr. Zadran in Zone B.  Accordingly, Mr. Zadran is eligible to be sentenced to a term of probation and to home detention.  United States Sentencing Guidelines, Sections 5B1.1(a)((2) and 5C1.1(c)(3).  We respectfully recommend that the sentence that is imposed include this feature.

      The government and Probation request terms of imprisonment due to what they perceive to be a pattern of lies and frauds, due to three serious crimes, and due to the fact that the latter two crimes were committed while Mr. Zadran was on probation.  We acknowledge that the crimes to which Mr. Zadran pleaded guilty are serious crimes.  They are felonies, and all federal felonies are serious crimes.  However, all federal felonies are rated according to their seriousness on a scale of 1 to 43.  It has been determined that the seriousness of Mr. Zadran's crimes is 7 on this scale.  That number speaks for itself.  In regard to the fact that the two recent crimes were committed while serving a term of probation, that fact is incorporated into the Criminal History Category.  That Criminal History Category would not be II if it were not for the fact that the recent crimes were committed while on probation.  (Report at paragraphs. 42, 43.)  Accordingly, the probationary term could not be a further aggravating factor as suggested by Probation (page

Hon. Loretta A. Preska
September 16, 2005          Page 2


24, Report) and the government (page 5, Letter).  *United States* v. *Sanchez-Solis*, 882 F.2d 693, 698 (2d Cir. 1989).

      The alleged pattern of lies and frauds falls into two categories: The previous conviction and the present convictions constitute the first category. The second category consists of nothing more than innuendo, unsubstantiated allegations, and imaginative interpretations and conclusions from actual facts.  The convictions speak for themselves.  As Probation and the government acknowledge, the prior conviction involved conduct that occurred in 1995, and it resulted in a term of probation.  The Report does not disclose the offense level for that conviction; presumably it was not great.  The present conviction also speaks for itself.  We will not attempt to minimize it.

      We believe that based on nothing more than what has been described above, (i.e., Level 7, Criminal History category II, prior conviction for acts committed in 1995 and sentence to a term of probation), the government would not be recommending a term of imprisonment for this Zone B offense and that the Court would not impose such a sentence.  Therefore, there must be something in addition to the foregoing factors to move the government to recommend imprisonment and to move Probation to make the same recommendation based on most of the same factors as those cited by the government.

      Those additional factors are nothing more than unsubstantiated innuendo, misinterpretations and far-out interpretations of actual facts, all of which this Court ought to reject even though it appears that this Court apparently has the power to consider such input. *United States* v. *Gelb*, 944 F.2d 52 (2d Cir. 1991) holds that the sentencing court is required to make findings of fact when evaluating disputed allegations, in accordance with Rule 32(c)(3)(D) of the Federal Rules of Criminal Procedure, which now appears to be Rule 32(i)(3) of the Rules. Under this formula, the government and/or Probation are free to bring unsubstantiated allegations to the court's attention, and the court is free to state that it will not rely on such innuendo, thereby obviating the mandate of ruling on the dispute, or it must rule on the dispute. Sentencing courts often opt to avoid ruling on the dispute by finding that the disputed matter will not affect sentencing.  Courts also are required to append to the presentence report their determinations for transmittal to the Bureau of Prisons.

      This is indeed a satisfactory and convenient procedure for the government, as well as for sentencing courts.  There is no requirement that an evidentiary hearing be held; just that a determination be made.  Yet there is no guidance for how such a determination can be made absent a full Rule 32 hearing, and those are cumbersome.  Invariably, courts rule that they are not relying on the disputed matter.  We respectfully suggest that the innuendo contained in this presentence report, which merely repeats whatever the government provided, as reflected in the government's subsequent and nearly identical letter to the court, should be rejected summarily and even stricken.

Hon. Loretta A. Preska
September 16, 2005          Page 3


      We will not attempt to dispute point by point every item of innuendo.  We represent that if a hearing were conducted on these items, the government would not be able to satisfy the preponderance standard required for sentencing purposes.


**The Leopard Skin Conviction**

      Zadran was sentenced to five years probation in 1997.  He denies any innuendo in paragraphs 37-41 of the Report about drugs and assault weapons.  The time to litigate such allegations was 1997.  Evidently, the government lacked proof at that time or else it would not have accepted a charge to smuggling a leopard skin.  In the alternative, it would have used its evidence of drugs and assault weapons as "relevant conduct" at the sentencing hearing in 1997.  These allegations either did not rise to the level of "relevant conduct" then, and were not raised by the government at that time or, if they were, that sentencing court rejected the government's evidence at that time as insufficient under the preponderance standard.  The government offers no reason to believe that the present allegations about drugs and assault weapons in 1995 ought to be considered at this time after the government failed to raise the allegations in a hearing at that time or after the allegations were rejected by the U.S. District Court for the District of Connecticut in 1997.

      Mr. Zadran denies the allegations contained in paragraphs 37 to 41 of the Report.

**The Implication that the Tax Loss Exceeds $8,000**

      The Report speculates (paragraph 81) that Mr. Zadran avoided a greater offense level and a higher sentencing range by "stipulating" to the loss reflected in the plea agreement, even though a greater tax loss could have been calculated based on the income reported to the probation office between 1998 and 2001.  As we explained to Probation in our letter of September 7, stipulations are not unilateral.  The plea negotiation was not a government "giveaway."  I personally accompanied Mr. Zadran to the office of the Joint Terrorism Task Force to go over the payroll and reimbursement records kept by the ambassador of the Islamic Emirates of Afghanistan.  Those records supported the tax loss upon which the parties ultimately agreed.  As in all negotiations, each party to the negotiation factored in its own evaluation of its litigation hazards.  The outcome is a tax loss less than $8,000.  The implication that Mr. Zadran somehow beat the system is inconsistent with my experience negotiating guilty pleas with the Office of the United States Attorney for this District.  Notably, the government's sentencing memorandum, which contains many of the arguments contained in the Report, does not join in the Report's speculation that the tax loss ought to have been greater.

We explained to Probation in our September 7 letter, as well as to the government during the plea negotiations, that the concept of "income" for probation reporting purposes is not necessarily identical to the concept of "income" for tax purposes.  Probation wants to know about all household income for purposes of evaluating a defendant's financial means.  The Internal Revenue Code (Title 26, United States Code, Section 61) contains a highly technical definition of income for purposes of determining a person's fair contribution to society.  The requirements of Probation for one purpose and of Congress and the IRS for another purpose differ.  The difference does not indicate greater wrongdoing by Mr. Zadran as the Report speculates.

**There Is no "Pattern of Evasion and Lies" Beyond that Reflected in the Plea Allocution**

The government refers to an alleged "pattern of lies and evasion" beyond that reflected in the plea allocution.  There is none.   The alleged lies are based on far-out interpretations and stretches.  No conceivable motive is suggested for some of the alleged lies and evasions that make up the so-called pattern.

### The Bank Fraud Conspiracy

First, the government discusses the facts of the bank fraud count.  It states that Zadran conspired to obtain a bank loan by falsely stating that his wife works for the Islamic Emirates of Afghanistan Mission to the U.N. ("I.E.A.") and by arranging to have that lie confirmed falsely.  That is true.  However, as the Report admits (paragraphs 13, 17, 92), any loss to the lending bank was too minimal to be calculated, the lending bank is not seeking restitution, and restitution is not an issue in this case.  Moreover, the loan was never in default, and Mr. Zadran paid it off completely. (Paragraph 13.)  While Mr. Zadran's guilt in conspiring to commit bank fraud is not disputed, that conspiracy can best be described as a conspiracy to defraud a bank of an amount of money that is too small to warrant restitution.

### Mr. Zadran's Statements to his Previous Probation Officer and to Immigration

Mr. Zadran denies that he lied to his previous probation officer or to the Immigration and Naturalization Service about anything.  He denies that he falsely said when he entered the country.  The previous probation officer apparently never made an issue of it.

The government's statement regarding Mr. Zadran's first marriage states no wrongdoing.  To the extent it implies a sham marriage, that implication, which the government is understandably loathe to state explicitly, is further undercut by a fact the government has omitted.  The government states that Mr. Zadran married in 1973, obtained U.S. citizenship in 1980 and "divorced after he obtained his U.S. citizenship."  The government does not state that

Hon. Loretta A. Preska
September 16, 2005			Page 5


he divorced "shortly after" he obtained his U.S. citizenship. Nor does it state when he divorced. Mr. Zadran and his first wife were divorced several years after he obtained his U.S. citizenship. Since the government does not say how these so-called lies were intended to benefit Mr. Zadran, or that he committed marriage fraud or immigration fraud, and since he was divorced years after he became a citizen in any event, it is difficult to discern how these statements are lies.  If the statements could not enable Mr. Zadran to obtain some undeserved benefit, the only reasonable conclusion is that there is some error or innocent explanation.

   The government states that Mr. Zadran and his first wife wrote on their marriage certificate that they live on Gerard Avenue in the Bronx but did not report to the Probation Department ever having lived in the Bronx.  The marriage certificate is based on a marriage application completed before the wedding.  Before the wedding, Mr. Zadran did not live with his wife.  They each had their own residence.  Hers was at Gerard Avenue in the Bronx.  They provided that address for their wedding certificate. After the wedding, they lived together on West 52nd Street.  Thus, they may never have lived together as husband and wife on Gerard Avenue.  Even if they did, Mr. Zadran is guilty of, at most, forgetting nearly 25 years later that he lived on Gerard Avenue briefly.  The government does not suggest any possible motive for defrauding the Probation Department in 1997 in regard to his residence in 1973 or any conceivable undeserved benefit from this "lie."

   Finally, the government argues that Mr. Zadran falsely reported to his probation officer that he continued to work for the Islamic Emirates of Afghanistan ("I.E.A.") mission to the U.N. "through August 2001," although the mission was closed in February, 2001.  (Letter page 5.) The government attaches to its letter "evidence" to prove Mr. Zadran misinformed Probation that he worked for I.E.A. "through August."  That attachment, a U.S. Probation Office report of monthly supervision, is dated August 5, 2001 – hardly "through" August.  Moreover, although the mission was officially closed by the U.S. Government in February effective immediately, that order ended the mission's consular activities only, i.e., issuing visas, passports, birth certificates, etc.  The mission remained open for the purpose of closing down in an orderly fashion.  As the I.E.A. payroll records in the custody of the Joint Terrorism Task Force indicate, Mr. Zadran was, indeed, paid by I.E.A. into July, 2001.  Thus, he did not misinform Probation about his employment as of August 5, 2001.  The footnote statement at page one of the government's letter that Mr. Zadran "not surprisingly" stopped reporting this employment at I.E.A. following the September 11 attacks is illogical, as well as being unsupported by any evidence.

Hon. Loretta A. Preska
September 16, 2005         Page 6


## CONCLUSION

The government cites the sentencing factors provided by 18 U.S.C. Section 3553(a) as it must. This is a standard inclusion in government sentencing recommendations. However, the government avoids relating these factors to its call for a term of imprisonment. This is not surprising. A careful reading of these factors fails to reveal any reason why Mr. Zadran should be imprisoned in these circumstances.

The only factor, it seems, that requires imprisonment is an alleged "pattern of lies and evasions." To the extent such a pattern is not supported by evidence, other than the evidence underlying the actual convictions, there must be a real, but unstated, reason to support the government's recommendation of imprisonment; something other than the flimsy, illogical and unsupported "pattern of lies and evasions."  Rule 32 does not provide a satisfactory means for a defendant to prevent a sentencing court from hearing innuendo, and the Second Circuit upholds such sentences based on sentencing court's statements that they are not relying on disputed allegations.

If we were to combat innuendo with innuendo, and engage in speculation to a fraction of the degree to which the government has, we might speculate that the Joint Terrorism Task Force needs convictions of any kind to show the public a sign of success, regardless of whether the convictions are related at all to terrorism. Maybe the public won't ask too many questions about the convictions. This defendant, through prior counsel, filed a motion to dismiss the indictment due to selective prosecution. That motion was denied for lack of evidentiary support. Under Supreme Court precedent, that ruling clearly was correct. Zadran's previous lawyers did not achieve the showing necessary to prove a violation of the Due Process clause of the Fifth Amendment, or even to warrant discovery. However, it is instructive that the government in its opposition papers did not deny Zadran's allegations that criminal tax prosecutions for the amount of tax loss alleged in the present Indictment are unprecedented. If taxpayers ordinarily are not prosecuted for such a small amount of tax loss, and if the bank fraud conspiracy does not rise to a level at which the defrauded bank wants restitution, it is valid for a sentencing court to inquire of the government: Why did the United States Attorney's Office obtain this indictment when taxpayers and bank borrowers who are similarly situated are not charged with tax evasion and bank fraud? A defendant's failure to meet the rigorous two-part standard required by the Due Process clause to warrant dismissal does not preclude a sentencing court from asking this question at sentencing.

Mr. Zadran should not be singled out for prosecution by the Joint Terrorism Task Force for reasons that would not apply to any other taxpayer or bank loan borrower. However, if he has been, and if the Supreme Court has ruled that this court has no power to dismiss, this court nevertheless could use its discretion and exercise moderation at the time of sentencing. A person should not be sentenced to jail if someone else in his position would not be. There is no two-part Due Process clause test; the court is fully free to impose a sentence of probation on this basis.

Hon. Loretta A. Preska
September 16, 2005          Page 7

      In support of this request, we note the following, which we believe the government would not dispute:

      Mr. Zadran cooperated fully in this investigation. He submitted to numerous interviews by the agents of the Joint Terrorism Task Force. He delivered I.E.A. records as part of his cooperation, records that contained the evidence of his unreported income. There is no shred of any suggestion that he is connected in any way to the gruesome acts of war perpetrated against this country in 1993, 1996, 1998, or 2001 by the terrorists to whom I.E.A. gave refuge. Mr. Zadran supported this country in its War against the Soviet Union before Good became Evil. He lost eleven family members in that War. Many credit that war as the final shot that led to the fall of the Soviet Union. In the 1980's, when hundreds of maimed Afghanistan citizens immigrated to the United States, Mr. Zadran took many into his home and coordinated with our State Department to locate hospitals to treat these people. He delivered maimed victims to the hospitals. He performed this humanitarian service as a volunteer.

      There is no reason to support the government's and Probation's apparently coordinated recommendations of imprisonment. There is no pattern of lies and evasion. This is a serious felony. As serious as it is, the Sentencing Guidelines permit a sentence of probation accompanied with home detention. We respectfully request such a sentence.

                                Respectfully,

                                Jared J. Scharf

cc: Stephen A. Miller, Esq.
     FAX 212-637-0412